**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ERIKA M. WILLIAMS, | ) | CASE NO. 1:20-CV-1494 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| KILOLO KIHAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Erika M. Williams ("Plaintiff" or "Williams"), challenges the final decision of Defendant, Kilolo Kihakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED and REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

# I.   PROCEDURAL HISTORY

On February 9, 2017, Williams filed an application for POD and DIB, alleging a disability onset date of July 30, 2016, and claiming  she was disabled due to autism spectrum disorder, anxiety disorder, and depression.  (Transcript ("Tr.") at 151, 194.)  The applications were denied initially and upon reconsideration, and Williams requested a hearing before an administrative law judge ("ALJ").  (Tr. 93.)     On  January  31,  2019,  an  ALJ  held  a  hearing,  during  which  Williams, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 28.)  On March 18, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 10.)  The ALJ's decision became final on May 5, 2020, when the Appeals Council declined further review. (*Id.* at 1.)

On  July  7,  2020,  Williams  filed  her  Complaint  to  challenge  the  Commissioner's  final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17, 18.) Williams asserts the following assignments of error:

> Whether the administrative law judge's finding of residual functional capacity is legally sufficient or supported by substantial evidence where his conclusions are inconsistent with the opinion evidence and the record as a whole, he failed to apply the regulatory factors in the evaluation of the opinion evidence, and he substituted his own opinion for those of the all other sources in the record?

(Doc. No. 15 at 1.)

# II.   EVIDENCE

## A.   Personal and Vocational Evidence

Williams was born in 1981 and was 35 years-old on her alleged disability date, making her a "younger" individual under social security regulations at all relevant times.  (Tr. 21.)  *See* 20

2

C.F.R. §§ 404.1563 & 416.963.  She has at least a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a retail sales clerk.  (*Id.*)

**B.      Relevant Medical Evidence- Mental Impairments[2]**

In May 2015, Dennis Marikis, Ph.D., completed a mental status questionnaire describing Williams' functional capacity.  (*Id.* at 270-1.)  He had treated Williams since March 2007.  (*Id.* at 270.)  He reported that Williams appeared disheveled at times, was "very shy" and "can't engage well in conversations."  (*Id*.)  He noted, "Erika is intelligent, memory is only 50/50.  Often forgets things."  (*Id*.)  He opined, "Erika would be unable to live alone.  She's dependent on dad and younger sister.  Bad/impulsive with money."  (*Id*.)

On May 4, 2015, Williams saw Ujwala Pagedar, M.D., for treatment of anxiety and depression.  She reported feeling better since she reduced her hours at T.J. Maxx.  (*Id.* at 289.)  Her diagnoses included moderate recurrent depression, panic disorder with agoraphobia, mild agoraphobic avoidance, and severe panic attacks.  (*Id.* at 290.)  Dr. Pagedar continued her Prozac, Viibryd, Trazadone, and Buspar, and "encouraged" Williams "to pursue her job roles" but noted that she "would likely be more suited to solitary work."  (*Id.* at 291.)

On June 17, 2015, consultative psychological examiner James Sunbury, PhD., evaluated Williams.  (*Id.* at 273.)  Dr. Sunbury noted Williams appeared anxious, rocked in her chair, was able to concentrate on and respond to questions, and was able to maintain her train of thought.  (*Id.* at 274  75.)  Williams reported panic symptoms and had a tremor, which she ascribed to her anxiety.

---

[2]      The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  The assignment of error in this case only involves Williams' mental impairments, therefore evidence relating to her physical impairments is omitted herein.

(*Id.* at 275.)  Williams reported that she was working two part-time jobs, at TJ Maxx one day a week and at the public library. (*Id.* at 274-5.)  Williams also reported that she had to leave work due to anxiety, in the past, but that she had not done so in 2015.  (*Id.* at 275.)  Dr. Sunbury found that Williams' memory and intellectual functioning were in the high-average range.  (*Id.*)  Williams also reported that she drove to work, did chores at home, took care of pets, went to the grocery store with her father, managed her own money, spent time with her sister, and had no social friends.  (*Id.* at 276.) Dr. Sunbury opined that Williams's anxiety sometimes limited her concentration; that she got along well with supervisors; had little anxiety when working alone; and had limitations in responding appropriately to work pressures involving social interactions or working with the public, due to her anxiety.  (*Id.* at 276  77.)

On July 6, 2015, Williams returned to Dr. Pagedar for treatment of depression and reported that her moods were stable, and she "is likely going to quit her departmental store job 1/week since she feels apprehensive."  (*Id.* at 293.)  He observed that Williams was gaining weight, which she attributed to stress eating.  (*Id.*)

On November 3, 2015,  Williams returned to Dr. Pagedar for treatment of depression and reported that her moods were stable and she had low energy but no crying spells.  (*Id.* at 304.)

On June 9, 2016, Andrea Whitmer, Ph.D., a psychologist, diagnosed Williams with Autism Spectrum Disorder.  (*Id.* at 278-85.)  Dr. Witmer also administered the Weschler Adult Intelligence scales, and Williams' subtest scores ranged from average to superior in all areas except working memory, where her score was "low average."  (*Id.* at 282.)  Her full scale IQ was in the "high average" range.  (*Id.* at 283.)

4

From June 14, 2016 to December 27, 2016, Williams participated in weekly therapy sessions with Donna Akuchie, LSW.  (*Id.* at 353-55.)  Ms. Akuchie worked with Williams on processing her autism spectrum diagnosis, improving socialization skills, and regulating her emotions and moods. Ms. Akuchie repeatedly noted Williams "rigid thinking patterns," negative thoughts and beliefs, difficulty calming herself once she becomes agitated, and difficulty with basic conversational norms such as asking and answering the question "how are you?"  (*Id.*)

On January 17, 2017, Dr. Pagedar noted Williams's depression and anxiety worsened after her cat became ill and required daily visits to the veterinarian.  (*Id.* at 332, 336.)  Dr. Pagedar increased Williams' dosages of Prozac and Buspar and continued Viibryd and Trazodone.  (*Id.* at 334.)  She also referred Williams for a consultation with psychiatrist Yogesh Desai, M.D. for recurrent depression and autism. (*Id.* at 335.)

From January 3, 2017 through April 11, 2017, Williams continued therapy with Ms. Akuchie.  (*Id.* at 356-57.)  Ms. Akuchie's observed that changes in Williams' medication significantly impacted Williams' mood, and continued to work with her on conversing, self-calming and challenging her rigid, "her cognitions which are so very negative and rigid."  (*Id.*)

On February 6, 2017, behavioral health therapist Colleen Shaughency, LISW-S, began treating Williams after a referral from Dr. Pagedar's office. Ms. Shaughency noted that Williams was tearful at times, with full affect, good eye contact, appropriately dressed, and appeared well groomed.  She presented as pleasant and cooperative throughout the screening process.  Ms. Shaughency diagnosed major depressive disorder, recurrent moderate; Asperger's syndrome; and generalized anxiety disorder.  (*Id.* at 349.)

On February 23, 2017, Williams reported to Ms. Shaughency that circumstances that worsened her anxiety included "being around people, any change in routine, environment, socialization, when feeling she doesn't have control of the situation." (*Id.* at 373.)  Ms. Shaughency observed she had full affect, euthymic mood, good eye contact, appropriate attire, was "fairly well groomed," and presented as pleasant and cooperative throughout the assessment process.  (*Id.*)

On March 9, 2017, Williams had an initial consultation with psychiatrist Dr. Desai. Williams reported that her anxiety and depression worsened when her mother died in 2012.  Dr. Desai observed that Williams had a sad looking facial expression, somewhat flat affect, and fair attention and concentration. He diagnosed depressive disorder and generalized anxiety disorder. (*Id.* at 497.)   He continued her medication.  (*Id.* at 498.)

On March 9, 2017, Ms. Shaughency noted that Williams had unwashed hair but was otherwise "fairly well groomed," with anxious affect and mood, good eye contact, and presented as pleasant and cooperative throughout the appointment.  Williams became tearful when talking about her cat's illness and her Social Security disability claim.  (*Id.* at 375.)

On April 7, 2017, Dr. Desai observed Williams was sad, tearful, seclusive, withdrawn, with flat affect.  She described sitting by herself at work, and reported she does not communicate with her coworkers.  (*Id.* at 496.)   Her psychomotor activities were in the lower range.  (*Id.*)   He decreased her dosage of Prozac.  (*Id.*)

On May 11, 2017, Williams sought an emergency evaluation from Dr. Desai, and reported feeling down and depressed, and losing interest and motivation. Going to work was a big challenge. Dr. Desai noted she was sad and tearful during the evaluation, with flat affect, and added Wellbutrin. (*Id.* at 494.)

6

On June 12, 2017, Williams sought an emergency evaluation from Dr. Desai, and reported losing interest and motivation, that she had been in the same position at the library since she started and that she had trouble organizing.  Dr. Desai noted she appeared more energetic. (*Id.* at 492.)

On June 29, 2017, Williams sought treatment from Dr. Desai, and  reported being told not to spend time on her phone after she was texting her father and sister at work because she was feeling lonely. Dr. Desai noted she was sad and tearful with a flat affect, and increased her dosage of Wellbutrin.  (*Id.* at 491.)

On June 13, 2017,  Ms. Shaughency noted Williams presented as pleasant and cooperative, but was easily tearful , with depressed affect and mood.  Williams reported her mood had improved since starting Wellbutrin but she still had periods when she was really down. She also reported that she had been working at the library for six years and hoped to be eventually be working full time. Ms. Shaughency noted Williams "is frustrated that she has been turned down every time she has applied for a full time position. She knows they have turned her down because of her difficulty with social skills and personal interaction."  (*Id.* at 394.)

On July 11, 2017, Dr. Desai noted Williams reported she was feeling more energetic, but had been feeling down and losing motivation.  Dr. Desai encouraged Williams to interact with her coworkers. (*Id.* at 490.)

On July 11, 2017, Ms. Shaughency noted Williams discussed her job and reported getting frustrated when she is corrected by her supervisor. "She feels targeted and doesn't believe other people are chastised about the things she gets in trouble for doing."  (*Id.* at 480.)  Additionally, "her supervisor also suggested she try being more social with her coworkers. Client began to cry when

describing how difficult that is for her because she never knows what to say and feels uncomfortable with small talk that isn't natural for her."  (*Id*.)

On July 25, 2017, Ms. Shaughency noted Williams was pleasant and cooperative with a depressed mood and affect and was crying through the session.  She reported struggling with depression since medication changes were made, and her worry about maintaining health insurance was interfering with her concentration at work.  (*Id*. at 478.)

On August 8, 2017, Williams reported to Dr. Desai that in the library where she worked installed carpet and painted, resulting in a work area with bright light that was affecting her a lot. She reported the frequency and severity of her anxiety and panic attacks had reduced somewhat. (*Id*. at 489.)

On August 17, 2017, Ms. Shaughency  observed Williams had full affect, good eye contact, appropriate attire, was well groomed, and presented as pleasant and cooperative.  She noted Williams reported that work was "kinda stressful."  (*Id*. at 476.)  She "began to cry when saying she doesn't like change. She is particularly unhappy that the floors are being changed from carpet to a shiny hard surface. She had built herself a cardboard barrier that isolated her from other staff however now she isn't able to use it."  (*Id*.)

On September 5, 2017, Williams reported to Dr. Desai that she had been able to interact with coworkers.  Dr. Desai observed that "she remained poorly groomed," with "less flat affect," and her psychomotor activities were improving.  (*Id*. at 488.)

On December 26, 2017, Williams reported to Dr. Desai that she was working up to 15 hours and lately had not been getting along or communicating with people, which may have some impact

8

on her low self-esteem. Dr. Desai observed Williams was sad and tearful, with psychomotor activities "in the lower range." (*Id.* at 486.)

On January 24, 2018, Williams reported to Dr. Pagedar that "on her birthday she felt inadequate in life with the money she makes and she did not get a raise in the library because her eval[uations] were not satisfactory. She does not want to change or find new job [due to] her problem with social interactions." (*Id.* at 405.) Dr. Pagedar noted that Ms. Williams had dysphoric mood, and was nervous and anxious. (*Id.* at 405-6.)

In a March 2018 letter, Ms. Shaughency reported that Williams's current diagnoses were Asperger's disorder; major depressive disorder, recurrent, moderate; generalized anxiety disorder; and social phobia. Ms. Shaughency opined that Williams:

> would have difficulty following directions if it is related to interacting with people
> by telephone or in person. She is capable of maintaining attention and concentration
> for 2 hour periods of time. However, in order to do this at her current job, she said
> she has a barrier placed around her desk area so she can't be distracted, see or be seen
> by her coworkers . . . She does have difficulty with communication and finds
> interacting with others difficult. She fails to understand nonverbal communication
> and finds interacting with others extremely difficult. She does not grasp the point
> of small talk and typical social pleasantries. Erika does perseverate on issues that
> she finds anxiety producing. Also when frustrated, she may react by crying. In a
> previous job, she has kicked items or thrown things down when upset.

(*Id.* at 399.)

On April 17, 2018, Williams reported to Dr. Desai that she had expected to get a new job at the library and was somewhat disappointed that it went to someone else. She was feeling somewhat down, depressed, and anxious and was thinking about possibly looking for another job. Dr. Desai noted her affect was less flat, and she was poorly groomed. (*Id.* at 484.)

On June 12, 2018,Williams reported to Dr. Desai that she was feeling down and depressed, as she had submitted an article to a magazine and it had been returned without comment. Her

9

psychomotor activities "appeared in lower range."  Dr. Desai increased her dosage of Wellbutrin and continued Viibryd, Buspar, and Trazodone.  (*Id.* at 483.)

On July 31, 2018, psychiatrist Carlos Molina Arriola, M.D., conducted a mental health assessment of Williams.  (*Id.* at 456.)  Williams reported that she feels judged, gets irritable and frustrated easily, sometimes feels worthless and on edge, or like she does not deserve to live. (*Id.*) She does not tolerate people touching her, does not like loud noises or lights, is rigid, and does not like change.  (*Id.*)  Her new boss was not supportive.  (*Id.* at 457.)  Her mental status examination showed she was tearful, her behavior was "deviant and restless and fidgety", her mood was ok, her affect was labile, she had concrete thought process, fair insight and judgment.  (*Id.* at 459-60.)  Dr. Arriola diagnosed autism spectrum disorder, major depressive disorder, and generalized anxiety disorder.  He stopped Wellbutrin and continued Viibryd, Buspar, and Trazodone.  (*Id.* at 460.)

On August 14, 2018, Ms. Shaughency provided additional information in relation to Williams' social security appeal.   She explained Williams's current diagnoses were Asperger's disorder; moderate episode of recurrent major depressive disorder; and generalized anxiety disorder. (*Id.* at 400.)  Ms. Shaughency reported, "I have reached out and worked with Opportunities to Ohioans with Disabilities and with the HR Coordinator at Williams' place of employment. I am sorry to say there has been little improvement. She has not been successful in being able to move to another position or gain additional hours due to her behavior and inability to improve skills." (*Id.*)  She opined that it was necessary for Williams to write down all instructions, because otherwise her anxiety that she might forget them made her unable to concentrate.  (*Id.*)  She also opined Williams had severe difficulty managing stress and interacting with others, difficulty maintaining attention and concentration, and was easily distracted by noise and talking.  (*Id.* at 401.)

On August 28, 2018, Dr. Arriola noted Williams reported that she was more frustrated and upset at work because "they change stuff and make my job difficult," "seems like nobody likes me," and "nobody talks to me."  (*Id*. at 527.)  Her mental status exam was unchanged.  (*Id*.) Dr. Arriola started Prozac, stopped Viibryd, and continued Buspar and Trazodone.  (*Id.* at 528.)

**C.      State Agency Reports - Mental Impairments**

In April 2017, State agency reviewing psychologist Robert Baker, Ph.D., reviewed the record and opined that Williams had the following limitations to her mental residual functional capacity ("RFC"):

- moderate limitation in the ability to concentrate persist or maintain pace;

- moderate limitation in the ability to adapt or manage oneself;

- marked limitations in the ability to interact with others;

- could perform 1-4 step instructions and task;

- limited to work in a separate workspace with occasional superficial interactions with others;

- may need occasional flexibility with breaks when experiencing increased symptoms;

- limited to work in a nonpublic setting with a small group that involves occasional and superficial interactions with others;

- supervisors should provide supportive and constructive feedback; and

- would need advance notice of major changes, which should be gradually implemented allowing her time to adjust to them.

(*Id.* at 56, 60-2.)

11

In August 2017, State agency reviewing psychologist, Kristen Haskins, Psy.D., reviewed the record and concurred with Dr. Baker's opinion, except that Dr. Haskins changed "1-4 step instructions" and "1-4 step tasks" to "short cycle tasks."  (*Id.* at 72, 74-6.)

**D.     Hearing Testimony**

During the January 31, 2019 hearing, Williams testified to the following:

- She works at a library.  They have not made her full time yet, and she is not sure she wants to be.  She currently works 5 more hours a week.  She'd like to make more money, but she doesn't know if she could deal with 40 hours a week. (*Id.* at 31-2.)

- Her work duties include checking in new books that come in on the computer.  (*Id.* at 33.)

- She used to work 15 hours a week.  Now she works 20 hours a week.  (*Id.*)

- She thinks she applied for one full time job at the library, but it involved dealing with people, so she didn't get it.  (*Id.* at 34.)

- Before she worked at the library, she stocked shelves at TJMaxx.  She stopped working there because the stress was causing her to have migraines, and panic attacks.  She was crying at work.  (*Id.*)

- In 2012, her mom died, and her anxiety got progressively worse after that.  Her mom was her support, and helped her deal with things.  (*Id.* at 35-6.)

- Dealing with people increases her stress. (*Id.* at 36.)

- If there's a lot going on, such as smells and sounds, it makes her more stressed out and she can have a panic attack.  (*Id.* at 36-7.)

- If she is already stressed out, a really strong, loud, or repetitive sound like a refrigerator running can make it worse. To avoid these things at work, she listens to headphones.  She has blocked off light with cardboard and moved things in front of her so she doesn't have to worry about the lights on her.  She uses the headphones at work almost every day.  If there's a lot of people talking, it's hard for her to concentrate.  (*Id.* at 37-8.)

- When a supervisor corrects her, she gets upset and feeling like she's not doing well.  When she gets upset she cries.  (*Id.* at 38.)

12

- She usually writes down instructions because it is hard for her to remember what to do.  She did this even while getting her college degree.  She has notebooks she carries with her everywhere, with instructions and lists.  If she reads and writes something, she retains it better, but she has trouble remembering things that she hears.  (*Id.* at 39-40.)

- She lives with her Dad, and has one friend.  She used to be closer to her friend when they were kids.  She has never had a boyfriend.  She tried internet dating , and went out with a man between 2 and 4 times, but it didn't go very far and "it wasn't a boyfriend thing."  (*Id.* at 41-2.)

- When she cries at work because of a supervisor's correction, she's kind of upset, nervous, and on edge the rest of the day.  (*Id.* at 42.)

- If she has a panic attack or meltdown, she has a hard time breathing, she gets shaky, her chest gets tight, she cries, and it's hard for her to think.  She tries to avoid them by using headphones, or walking away before it gets that bad.  (*Id.* at 43-5.)

The VE testified Williams had past work as a retail sales clerk.  (*Id.* at 46.)  The ALJ then posed the following hypothetical question:

> If I found that Ms. Williams had no exertional limitations and she retained the ability to understand, remember, and carry out simple, repetitive tasks, and able to respond appropriately to supervisors and co-workers in a task-oriented setting, with no public contact, and occasional interaction with co-workers, would she be able to return to that previous job?

(*Id.*)

The VE testified the hypothetical individual would not be able to perform Williams' past work as a retail sales clerk.  (*Id.* at 47.)  The VE explained the hypothetical individual would be able to perform other representative jobs in the economy, such as unskilled hand packer, unskilled cleaner, or unskilled machine feeder.  (*Id.*)  The VE testified that if psychological problems prevented the person from working more than 20 hours a week it would preclude all full-time employment.  (*Id.*)

13

In response to questions from Williams' counsel, the VE explained that if the person needed constructive and supportive feedback, "there's no way to guarantee that she would get that at work unless there was some type of, I would say, professional intervention with that supervisor." (*Id.* at 48.)  If the person needed to have a separate work space in which she could control the level of interaction with others, the vocational expert testified that an isolated work setting would require selective placement in vocational rehabilitation.  (*Id.* at 49.)  If the person needed occasionally have some control or flexibility for when they take breaks, it would be considered an accommodation. (*Id.* at 49.)  If the person needed to be able to wear headphones, it could pose a safety issue and at just about any job would be some type of accommodation, but would vary from employer to employer.  (*Id.* at 49-50.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 & 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

14

First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) & 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) & 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

Here, Williams was insured on her alleged disability onset date, July 30, 2016, and remained insured through June 30, 2019, her date last insured ("DLI.")  (Tr. 15.)  Therefore, in order to be entitled to POD and DIB, Williams must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2019.

2.    The claimant has not engaged in substantial gainful activity since July 30, 2016, the alleged onset date.

3.    The claimant has the following severe impairments: Asperger's/Autism Spectrum Disorder, depression and anxiety.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to understand, remember, and carry out simple repetitive tasks; respond appropriately to supervisors and coworkers in a task oriented setting with no public contact and occasional interaction with coworkers.

6.    The claimant is unable to perform any past relevant work.

7.    The claimant was born on **, 1981, and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.    The claimant has at least a high school education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from July 30, 2016, through the date of this decision.

16

(Tr. 15-22) (internal citations omitted).

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act,

17

without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Williams asserts that the ALJ's RFC determination is legally insufficient and unsupported by substantial evidence. (Doc. No. 15 at 15.) She argues the ALJ failed to properly evaluate the opinion evidence under Social Security regulations, and failed to provide any meaningful analysis as to why the opinions were in conflict with the record. (*Id*. at 17-23.) She also asserts he failed to consider the record as a whole, because he inappropriately ignored her subjective reports, overstated her work performance, and misrepresented her functioning during the hearing. (*Id*. at 20; Doc. No. 18 at 4-5.) Further, she asserts he failed to apply Social Security Ruling 00-1c to his consideration of the fact that Williams received accommodations under the ADA which enabled her to maintain part time employment. (*Id.* at 22.)

The Commissioner responds that the ALJ reasonably considered the "scant" objective evidence of Williams' mental impairments and reasonably accommodated the functional limitations resulting from those impairments in his determination of her mental RFC. (Doc. No. 17 at 8.) Further, he asserts the ALJ reasonably properly discounted all the opinions in the record because they were inconsistent with other medical record evidence, and he adequately explained this reasoning. (*Id.* at 9-10.) Finally, he asserts that the ALJ properly evaluated Williams' subjective complaints. (*Id.* at 14-15.)

The RFC determination sets out an individual's work-related abilities despite her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC

based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96‑8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, at step two, the ALJ determined Williams suffered from the severe impairments of Asperger's/Autism Spectrum Disorder, depression and anxiety. (Tr. 15.) After determining that Williams did not have a condition that met or medically equaled a listing, the ALJ adopted the following determination of RFC:

> the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to understand, remember, and carry out simple repetitive tasks; respond appropriately to supervisors and coworkers in a task oriented setting with no public contact and occasional interaction with coworkers.

(*Id.* at 17.)

20

A.    **Opinion Evidence**

Williams argues that the ALJ adopted a mental RFC determination that is less restrictive than any of the opinions of record.  However, the Sixth Circuit explained that an RFC determination does not have to be contained in a medical opinion, because "the Commissioner has final responsibility for determining an individual's RFC . . . and to require the ALJ to base her RFC finding on a physician's opinion 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013).  *See also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. Apr. 30, 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."); *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-3 (6th Cir. Sept. 26, 2017).  However, although an ALJ has considerable discretion in this area, he or she does have an obligation to clearly explain the reasoning underlying the RFC determination.  For the reasons set forth below, the ALJ failed to meet that obligation in this case,  preventing the Court from providing meaningful appellate review.

i.    **Opinions of State Agency Reviewing Psychiatrists**

The ALJ addressed the opinions of the State agency reviewing psychiatrists very briefly, as follows:

> The record generally supports the claimant's limitations regarding interactions with others; however, the undersigned finds that the remaining mental limitations assessed are not consistent with the evidence.  Accordingly, the undersigned gives the opinion only partial weight.

(Tr. 19.)  This explanation of the ALJ's reasoning raises more questions than it answers, however, because although the ALJ explains "the record generally supports the claimant's limitations regarding interactions with others," he did not adopt these limitations.  The State agency reviewing psychiatrists both opined that Williams had the following limitations regarding interactions with others:

- "She is able to work in a separate workspace with occasional superficial interactions with others."

- "[Claimant] is able to work in a nonpublic setting with a small group that involves occasional and superficial interactions with others.  Supervisors should provide supportive and constructive feedback."

(*Id.* at 61-2.)   In contrast, the ALJ's RFC asserted Williams could "respond appropriately to supervisors and coworkers in a task oriented setting with no public contact and occasional interaction with coworkers."  (*Id.* at 17.)  The ALJ's RFC departed from the State agency reviewing psychiatrists' opinions in significant ways, including:

- not requiring a separate workspace;

- not limiting the size of the group of co-workers and supervisors Williams could interact with;

- not limiting the quality of the social interaction to "superficial;" and

- not limiting the type of feedback supervisors should provide Williams.

As discussed below, the social limitations which the ALJ declined to adopt are echoed in other opinions throughout the record.  Further, the ALJ does not identify the evidence that he deemed inconsistent with these opinions.[3]  Nor can the Court infer this information, as the ALJ summarizes

---

[3]     Although the ALJ references Williams' employment history, the limitations in the State agency reviewing psychiatrists' opinions appear consistent with the accommodations provided at her workplace.

22

the entire record in three pages, and offers little discussion of the relevant evidence.  (*Id.* at 16-19.)

The Commissioner also offers no insight into the ALJ's reasoning.  His brief reiterates the State agency reviewing psychiatrists' opinions, restates the ALJ's brief explanation, and then cites the regulation explaining that more weight is generally given to medical opinions that are consistent with and supported by relevant evidence.  (Doc. No. 17 at 10  11.)  However, he fails to offer any explanation for the discrepancy between the ALJ's professed conclusion that State agency reviewing psychiatrists' opinions were generally consistent with the record evidence regarding Williams' social limitations, and the fact that the ALJ adopted social limitations significantly less restrictive than those determined by the State agency reviewing psychiatrists.  Instead, he correctly notes that "nothing obligated the ALJ to make the leap from persuasive to controlling," without acknowledging that the ALJ also has a legal obligation to clearly explain his reasoning in a manner sufficient to enable judicial review.

The Sixth Circuit has made clear that "an ALJ's decision must articulate with specificity reasons for the findings and conclusions that he or she makes."  *McHugh v. Astrue*, No. 1:10-CV-734, 2011 WL 6130824, at *4 (S.D. Ohio Nov. 15, 2011), *report and recommendation adopted sub nom. McHugh v. Soc. Sec. Com'r*, No. 1:10CV734, 2011 WL 6122758 (S.D. Ohio Dec. 8, 2011)*, quoting Bailey v. Com'r of Soc. Sec.*, 173 F.3d 428, 1999 WL 96920 at *4 (6th Cir. Feb, 2, 1999). *See also Hurst v. Sec. of Health and Human Servs.*, 753 F.2d 517 (6th Cir. 1985) (articulation of reasons for disability decision essential to meaningful appellate review); SSR 82  62 at *4 (the "rationale for a disability decision must be written so that a clear picture of the case can be obtained").

In this case, the ALJ's scant explanation of his reasoning is insufficient to provide a clear and logical bridge between the evidence and the result.  Therefore, this case must be remanded for a fuller explanation of the ALJ's treatment of the State agency reviewing psychiatrists' opinions.

**ii.        Opinion of Treating Social Worker**

The ALJ's explanation of his evaluation of the opinion of Williams' social worker, Ms. Shaughency, is equally opaque:

> While Ms. Shaughency is the claimant's treating therapist, a licensed social worker is not considered an acceptable medical.  Thus, her opinion is not entitled to significant weight especially given that she offers more limitations than supported by the objective evidence of record or assessed herein.  Additionally, the final responsibility for determining the claimant's ability to work is reserved for the Commissioner.  The evidence that the claimant has maintained regular employment for many years belies Ms. Shaughency's opinion regarding the claimant's lack of "ability to be self-directive towards employment."  Moreover, Ms. Shaughency even notes the claimant's desire to work full-time and her progress towards self-advocacy. The undersigned gives Ms. Shaughency's opinion little weight.

(*Id.* at 20) (internal citations omitted).  The ALJ's statement of the law is correct: agency regulations state that the Commissioner alone is responsible for determining whether a claimant is disabled and unable to work.  20 C.F.R. § 404.1527(d)(1); *see also id.* § 404.1527(d)(3).  However, as explained *supra*, the ALJ does have an obligation to explain his reasoning with sufficient clarity to enable meaningful judicial review.  Again, the ALJ draws conclusions that lack a clear connection to the evidence of record.

First, the ALJ asserts that because Williams "has maintained regular employment for many years," she is able to be "self-directive" toward employment.  This omits critical facts such as Williams inability to work enough hours to qualify as "substantial gainful activity" under the regulations at any time throughout the relevant period.  (*Id.* at 15.)  In addition, he does not address evidence showing that even this limited success required accommodations on the part of Williams'

24

employer, such as allowing her to create a cardboard barrier around her desk to isolate herself from co-workers and wear headphones while working.  (*Id.* at 37-8, 45, 401, 476.)

Next, he asserts that because Ms. Shaughency documented Williams' desire to work full-time, she should have opined that she was able to do so.  (*Id.* at 20.)  This ignores the context of Ms. Shaughency's observation, which explained that Williams was not able to reach this goal because of her severe mental impairments.  Ms. Shaughency's treatment note stated Williams "is frustrated that she has been turned down every time she has applied for a full time position. She knows they have turned her down because of her difficulty with social skills and personal interaction."  (*Id.* at 394.)

Finally, the ALJ notes Williams' "progress towards self-advocacy," but failed to acknowledge ample record evidence that she had not yet achieved that goal.   In October 2017, a performance review from her library supervisor identified "Improvement Required" in the areas of teamwork, flexibility, interpersonal skills, and keeping statistics of processing accomplished.  (*Id.* at 163-5.)  Her supervisor noted Williams "has difficulty learning new procedures.  Keeps pretty much to herself and at times it difficult [sic] for her to work with other people. . . . still needs to work on handling stress . . . . conversations with other staff members is still difficult for her."  (*Id.* at 163.)  Employment records from the library also show that, in March 2018, Williams applied for at least one job at the library with higher pay and longer hours, but was rejected because of her poor interpersonal communication skills.[4]  (*Id.* at 168.)  In August 2018, Ms. Shaughency explained, "I have reached out and worked with Opportunities to Ohioans with Disabilities and with the HR

---

[4]     All this evidence is also in conflict with the ALJ's assertion that there was "no indication of poor or unacceptable job performance" in the record.  (Tr. 18.)

Coordinator at Ms. Williams's place of employment. I am sorry to say there has been little improvement. She has not been successful in being able to move to another position or gain additional hours due to her behavior and inability to improve skills." (*Id.* at 400.)  The same month, Williams also reported difficulties with her part-time employment to her treating psychiatrist, Dr. Arriola, who noted Williams reported that she was more frustrated and upset at work because "they change stuff and make my job difficult," "seems like nobody likes me," and "nobody talks to me." (*Id.* at 527.)

In contrast, the ALJ does not identify any record evidence that supports his assertion that Williams' ability to maintain a limited, part-time work schedule, and expressed desire to work full-time demonstrate an ability to obtain and maintain competitive employment sufficient to comprise substantial gainful activity.  Again, the ALJ fails to provide a clear explanation creating a logical bridge between the evidence he cites and the resulting determination.  Therefore, this case must be remanded for a fuller explanation of the ALJ's treatment of Ms. Shaughency's opinion.

**B.     Subjective Evidence**

Williams also asserts that the ALJ misrepresented the hearing testimony in his statement that "while at times tearful, [Williams] presented to the hearing as polite, cooperative, and did not display any problems interacting with the other participants or answering questions." (*Id.* at 19.)  Because this case is being remanded on separate grounds, the Court will not address this assertion in detail. However, the undersigned notes that the hearing transcript indicates that, at times, Williams was unintelligible to the ALJ.  For example, the ALJ informed Williams "I have no idea what you're saying.  Maybe you can gather your thoughts a little and try to explain it because your voice is going somewhere else and I have no idea what you're saying." (*Id.* at 42-3.)  One page later, the transcript

26

shows the ALJ again interrupted Williams' testimony, explaining "You can say what you need to say, but we need to record it and try to understand what you're saying.  You're not getting any better.  If you need to go outside and take a few minutes, that's fine."  (*Id.* at 44.)  The transcript indicates Williams then took a 5 minute break, and after which Williams was able to offer only brief testimony in response to questions from her attorney.  The ALJ did not try to question her further.

This record is inconsistent with the ALJ's assertion that Williams "did not display any problems interacting with the other participants or answering questions" at the hearing.  (*Id.* at 19.)  Therefore, the ALJ should take the opportunity of remand to clarify the reasoning behind his characterization of Williams' hearing testimony.

**C.      Social Security Ruling 00-1c**

SSR 00-1c explains that an individual's claim for, or receipt of, disability insurance benefits filed under the Social Security Act does not preclude the individual from pursuing relief under the Americans with Disabilities Act.  Neither party cites case law applying this Ruling to a situation analogous to this case, where the claimant is able to work part-time with ADA accommodations, but, even with accommodations, is not able work sufficient hours to constitute "gainful employment" under Social Security regulations.  Further, Williams has not made a claim under the ADA.  Here, Williams asks the Court to find that the ALJ erred by not including her workplace accommodations in his consideration of her ability to maintain part-time employment, and omitting them from her mental RFC determination.  (Doc. No. 15 at 22.)  Because this case is remanded on other grounds, in the interests of conservation of judicial resources, the Court will not address the merits of this argument.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED and REMANDED for further consideration consistent with this decision.  On remand, the ALJ should provide a fuller explanation of the reasoning underlying his treatment of the opinions of the State agency reviewing psychiatrists' and Social Worker Shaughency.  Further, the ALJ should take the opportunity of remand to clarify his treatment of Williams' hearing testimony and employment history.

**IT IS SO ORDERED.**

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: August 18, 2021

28